# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

|  |  |  |
|---|---|---|
| JULIAN EDELMAN, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. |
| ASSAF SWISSA, | ) ) | |
| Defendant. | ) ) ) | kg |

**COMPLAINT AND JURY DEMAND**

**i. Introduction**

1.      This case arises from Defendant Assif Swissa's ("Swissa") calculated exploitation of Plaintiff Julian Edelman ("Edelman"), a famous and highly regarded retired wide receiver for the New England Patriots (the "Patriots"), to enable the initial survival and eventual strong growth of the online advertising and marketing firm, Superdigital LLC ("Superdigital"). For more than a decade, Swissa leveraged the name, access, and public stature of Edelman to advance his own interests. Swissa always treated Edelman as a partner in Superdigital, expected Edelman to act like an owner of the business (as Edelman did), and was clear with Edelman and others that Edelman was a partner in Superdigital. Indeed, at every opportunity Swissa broadcast to potential clients, investors, and others that Edelman was Swissa's partner in their advertising agency. By trading on Edelman's fame, reputation, contacts, and leads, Swissa and Edelman together grew Superdigital into a $50 million social media management and advertising business. Indeed, because he knew he was a partner, Edelman happily used his fame and connections to

provide Swissa access to high-level executives and other key individuals at companies that might use Superdigital's services (including when his agent and others counseled against doing so) because he wanted to grow Superdigital, his business. If he did not know and believe he was a partner in Superdigital, Edelman would never have done so. When Swissa decided to capitalize on the value he grew on Edelman's back, however, he cut Edelman out from the proceeds entirely. Through this action, Edelman seeks to be made whole for his central role in building Superdigital.

2.      Swissa's use of Edelman to jumpstart and grow Superdigital can hardly be overstated. After being fired from a startup company Swissa purportedly co-founded, Swissa sought to resurrect his professional career and get his start in influencer marketing by founding Superdigital, which managed Edelman's social media beginning in or around the summer of 2013. As Edelman's profile rose based upon his outstanding on-the-field success, so did Swissa's use of him. Following Edelman's breakout season in 2013, Swissa called upon Edelman to introduce him to key clients, promote Superdigital's services publicly, provide strategic input and attend pitches, and allow Swissa to use his name to prop up Swissa's own credibility.

3.      Based on Swissa's statements that Edelman was Swissa's partner and that Swissa would "do right" by him, statements that Swissa made to Edelman directly and to many third parties, Edelman invested his time and energy into Superdigital for over a decade. Edelman knew that he was a partner in Superdigital, as much as Swissa was. In pitches with investors or potential clients, Swissa referred to Edelman as his "partner" to gain credibility; Swissa represented to Edelman that he was a "partner" with respect to Superdigital (and that compensation was forthcoming) so that Edelman would continue agreeing to promote the company. Swissa and Edelman together pitched investors on the strategic vision of Superdigital

2

to become a media powerhouse, and Edelman brought Superdigital's keystone clients to Superdigital. Edelman never would have acted as a partner in this way, including without seeking ongoing compensation, if he did not know that he in fact was a partner. Edelman trusted Swissa, whom Edelman believed to be his close friend.

4.      Edelman's services and contributions between 2013 and 2025 were critical to Superdigital's growth from a small social media management company of just three-to-four employees into a leading and award-winning advertising agency with a swath of corporate clientele (which Edelman enabled the company land). When Swissa eventually aspired to expand Superdigital's business beyond social media management and advertising, he called upon Edelman to assist Superdigital in landing corporate clientele and growing the business. Edelman was happy to help because he understood that he was growing his own business. At Swissa's request, Edelman introduced Superdigital to several key clients, including Microsoft, Guy Fieri, and Papa Gino's. These became critical accounts for Superdigital, which not only kept the company's lights on when it was struggling financially, but were the driving force behind its eventual multi-million-dollar sale value.

5.      In August of 2025 Swissa successfully executed on his plan to scrounge every last drop of value from Edelman before cashing in on the business he had built on the back of his association with Edelman and the leads Edelman generated: Swissa sold Superdigital for nearly $50 million and gave Edelman exactly nothing. Indeed, in the lead up to the sale, Swissa shut out Edelman completely and concealed details of the sale for months. In other words, Edelman received no compensation for his share of the business, or for his quite valuable contributions to the survival and growth of Superdigital. It was thus only upon the sale of the business in August of 2025 when Edelman realized the reality of Swissa's unlawful plan.

3

6. By and through this action, and as more fully alleged below, Edelman seeks damages based upon claims for (i) unjust enrichment; (ii) a declaratory judgment that Edelman was a partner in Superdigital; (iii) breach of fiduciary duty; and (iv) promissory estoppel.

## ii. Parties

16. Plaintiff Julian Edelman is an individual residing at 871 Leonard Road, Los Angeles, California 90049.

17. Defendant Assaf Swissa is an individual residing at 2485 NW 46th Street, Boca Raton, Florida 33142.

## iii. Jurisdiction and Venue

18. This Court has subject matter jurisdiction over this action because the claims arise out of conduct that occurred primarily and substantially within the Commonwealth of Massachusetts, and the controversy concerns business activities undertaken in Massachusetts by the parties.

19. Personal jurisdiction is proper because Swissa transacted business within Massachusetts, engaged in conduct causing tortious injury within Massachusetts, and purposefully availed himself of the privilege of conducting activities in Massachusetts such that the exercise of jurisdiction comports with fair play and substantial justice.

20. Venue is proper in Suffolk County because a substantial part of the events or omissions giving rise to the claims occurred in Suffolk County, Massachusetts, and because Swissa conducted significant business activities in Suffolk County, including meetings, client pitches, and communications with Edelman.

21. At all relevant times, Superdigital, founded by Swissa, maintained its principal place of business on Commonwealth Avenue in Boston, Massachusetts, which is within Suffolk

4

County. Superdigital was a Massachusetts limited liability company for most of the at-issue time period, until late 2023.

22.    The wrongful conduct at issue – including Swissa's express statements and conduct during business meetings, client pitches, negotiations, and Swissa's concealment of the sale – occurred primarily and substantially in Massachusetts, and specifically within Suffolk County.

23.    Edelman and Swissa conducted significant business activities in Suffolk County, including meetings and client pitches that form a substantial part of the events giving rise to the claims asserted herein.

24.    The confrontation regarding the sale of Superdigital, between Edelman and Swissa, described below and which has significant nexus to the claims asserted herein, occurred in Boston, Massachusetts, specifically on Commonwealth Avenue, within Suffolk County.

25.    Both parties have transacted business in Massachusetts, and the events giving rise to the claims occurred in this jurisdiction, rendering the exercise of jurisdiction proper and venue in this Court appropriate.

### iv. Factual Background

**A.    After His Initial Failure, Swissa Latches Onto Edelman.**

27.    Edelman was drafted by the New England Patriots (the "Patriots") as the 232nd overall pick in the seventh round. Edelman was a quarterback in college football, but the Patriots drafted him to play as a wide receiver.

28.    Swissa and Edelman first met after Edelman was drafted by the Patriots at a Boston salon owned by Swissa's father, Pini Swissa. Edelman and other Patriots got their hair cut at Pini Swissa's salon.

5

29.     When Swissa and Edelman met, Swissa held himself out as a co-founder and the chief creative officer for a startup called Unreal Brands, Inc. ("Unreal"), which focused on providing healthier, "non-GMO" alternatives to classic chocolate candies.

30.     In 2012, Unreal terminated Swissa, even though he was purportedly a co-founder. Swissa considers his time at Unreal as a "complete failure." According to Swissa, although Unreal's candy was selling to retailers, consumers were not purchasing the products at stores. Swissa was shocked when the company decided to terminate him.

31.     Unreal later relaunched without Swissa in 2014, and it is now achieving financial success.

32.     Edelman had a promising rookie season in 2009, but he saw a decrease in playing time on offense in 2010. In 2011, the Patriots primarily used Edelman on defense, special teams, and sparingly on offense. During the 2012 season, Edelman broke his right foot, which prematurely ended his season.

33.     Following the 2012 season, Wes Welker left the Patriots to join the Denver Broncos, which seemingly created an opportunity for Edelman to fulfill a need in the Patriots' offense. Prior to the start of the 2013 season, however, the Patriots signed Danny Amendola, who played the same position as Edelman.

34.     Edelman became a free agent after the 2012 season. He signed a one-year contract with the Patriots with a maximum value of $1.015 million (and no guaranteed money). This meant that Edelman's performance during his 2013 season was critical for the future of his career.

35.     In July of 2013, still reeling and at "rock bottom" from his termination, Swissa founded Superdigital, a Boston-founded digital advertising agency. At or around the time when

6

Superdigital started, it had only a few employees, including Swissa and his girlfriend at the time. Superdigital began operating on Commonwealth Avenue in Boston, Massachusetts.

36.     Eager to get his career back on track, at or around the same time Superdigital was founded, Swissa utilized his father's connection to Edelman to pitch Superdigital's social media management services. Specifically, Swissa's father was Edelman's barber and Swissa pitched Edelman on Superdigital while Edelman was getting his hair cut.

37.     Edelman became the first client of Superdigital and its prototype for brand building and influence content. Beyond that, he collaborated with Swissa in creating content and merchandise geared at growing Edelman's personal brand. Superdigital also began managing Edelman's social media accounts. In collaboration with Edelman, Superdigital began producing humorous spoof and branded content for Edelman's brand. By way of example, Superdigital marketed and sold "JE11" merchandise, which was a play on Tom Brady's "TB12." Superdigital produced *Smoothietyme*, a cooking show hosted by Edelman focused on the ingredients for smoothies. Superdigital, with collaboration and input from Edelman, also produced *PATS: Cleaning the Streets*, a spoof on the television show *Cops*, in which Edelman and Danny Amendola solved crimes and apprehended criminals.

38.     Through the process of building Superdigital together and managing Edelman's social media presence, Edelman and Swissa became close personal friends. Swissa often referred to Edelman as his "best friend" and "brother." Edelman thought the same of Swissa. Their mutual Jewish background also played a part in their close friendship, and Swissa gained Edelman's trust.

7

**B.** **Edelman's 2013 Season Propels His Career and Superdigital's Success.**

39.     By all accounts, 2013 turned out to be Edelman's "breakout season." He played in all 16 games and amassed 105 receptions for 1,056 yards and 35 punt return opportunities for 374 yards. Although the Patriots lost in the AFC Championship Game, Edelman performed well and produced strong numbers in the playoffs, which earned Edelman notoriety among Patriots' fans.

40.     Edelman's popularity, especially in Massachusetts and New England, began to increase as a result of his successful 2013 season.

41.     Due to Edelman's rising popularity, and the content Edelman was making in collaboration with Swissa, Superdigital's videos featuring Edelman also began gaining popularity and increased viewership. This content generated revenue for Superdigital and increased Superdigital's visibility to other potential clients. Indeed, with Edelman's rising social media presence and humorous on-screen personality, Superdigital started to become recognized as a specialist in the niche (and relatively new) business of influencer marketing and content creation on social media.

42.     Following the 2013 season, Edelman's performance on-the-field continued to improve, and his popularity continued to grow. Indeed, Edelman's on-the-field achievements between 2013 and 2018 – for example, his difficult Super Bowl catch in 2016 and Super Bowl MVP performance in 2018 – materially increased his celebrity and marketability. For his efforts, Edelman began consistently appearing in the NFL's annual top 100 player list.

43.     Alongside his on-the-field success, Edelman also developed into one of the most engaging professional athletes on social media.

8

**C.      Swissa Leverages Edelman's Access and Popularity to Pitch Superdigital to Corporate Clients.**

44.      Swissa was never satisfied with Superdigital being just the social media management company behind the successful social media presence of the now-famous Edelman. On the contrary, Swissa aspired to scale Superdigital to the point where it was also managing the advertising and social media for large corporate clients. To accomplish this goal, Swissa enlisted his "best friend" and "partner" Edelman – the protype for Superdigital's influencer content business – to gain access to pitch opportunities for Superdigital.

45.      The topic of Edelman's compensation in connection with Superdigital arose repeatedly in conversations between Edelman and Swissa, and Swissa consistently represented to Edelman that he was Swissa's "partner" and Swissa would "take care of" Edelman "down the road." Swissa also repeatedly referred to Edelman as his "partner" both to investors and clients. Indeed, it was Swissa's practice when pitching potential clients to say to them that he and Edelman together owned a digital advertising agency (Superdigital) and, later, that they owned a production company (Coast Productions) together. Swissa did so in order to gain credibility and influence with those potential clients.

46.      Following the radical increase in Edelman's fame and reputation, Swissa began leveraging Edelman's popularity to access potential clients for Superdigital and expand Superdigital's capabilities beyond influencer content creation and management. Edelman permitted Swissa to do so based upon Swissa's clear and repeated representations that Edelman was his partner and would be "taken care of."

47.      Superdigital was always run informally. On information and belief, Superdigital never held regular meetings. Rather, business decisions, including day-to-day management as well as broader questions about the direction of the business, were made informally. On

9

information and belief, Superdigital did not observe corporate formalities like holding annual meetings, and it did not have formal investor meetings.

48.    Upon information and belief, Swissa was Superdigital's only member before Edelman, too, became a member.

49.    Beginning in or around 2015, at Swissa's request, Edelman regularly used his influence to introduce Swissa to potential clients on numerous occasions, and these introductions materialized into Superdigital's most lucrative and profitable projects and client relationships.

50.    On a number of occasions, Edelman ensured that Swissa could attend private events, where Swissa would have the opportunity to network with executives of potential clients. Both Edelman and Swissa recognized the symbiotic nature of their relationship for the business: Edelman was able to open doors to opportunities that Swissa could not otherwise access, and Swissa had the sales abilities to make the most of those leads. Indeed, Edelman would request and obtain access for Swissa even in circumstances where Edelman's agents or other business associates pleaded with him that Swissa be excluded.

51.    Swissa's sales strategy for Superdigital followed a clear pattern centered around his proximity to Edelman: (i) Swissa would first use Edelman to gain access to pitch opportunities; (ii) once in, Swissa would hold himself out as Edelman's "partner" and flout his association with Edelman to increase his own credibility; and (iii) Swissa would then use Edelman's social media success to showcase Superdigital's capabilities.

52.    Swissa explained to Edelman, on numerous occasions, that networking events and opportunities to pitch potential clients were what "excited" him, and he pleaded with Edelman to get him access to such opportunities so that he could drum up business for Superdigital. Again, Edelman only agreed to obtain access for Swissa to attend events based upon Swissa repeatedly

10

representing that he and Edelman were "partners" with respect to Superdigital and that he would be compensating Edelman "down the road." In other words, Edelman acted like a partner because he knew he was a partner.

53.     Beginning in or around 2017, Swissa pitched the idea to Edelman that marketing Superdigital and Coast Productions together, as a "one-stop-shop" for advertising and production could expand both businesses.

54.     Swissa regularly represented to Edelman and to potential clients or investors that he and Edelman "owned an ad agency together" along with their production company, Coast Productions. Indeed, to impress investors and clients, Swissa flouted Edelman's involvement in Superdigital.

55.     Swissa enlisted Edelman's help with strategy for Superdigital and sought input from Edelman regarding content. Swissa treated Edelman as if he were part of Superdigital – because he was – periodically asking Edelman to physically appear at Superdigital's offices to "boost morale" and demonstrate to clients that Edelman was heavily involved in the company's operations.

56.     Because Swissa assured Edelman that he would be compensated for his contributions to Superdigital, Edelman agreed to play a central role in nearly all the company's major deals as well as the company's pitches to investors. Edelman was also central to all of Swissa and/or Superdigital's major successes.

57.     Edelman's work was extremely valuable to Superdigital in general and to Swissa in particular. Without Edelman's contributions, including lead generation, the value of his association with Superdigital, and other contributions, Superdigital never would have survived at all. It certainly would not have succeeded to the point of warranting a $50 million sale.

11

58.    Some examples of Edelman's work to provide Swissa access to potential clients, which ripened into cornerstones of Superdigital's business, include:

### Papa Gino's and D'Angelos Grilled Sandwiches

59.    In or around January 2015, Edelman provided Swissa with field access at Super Bowl XLIX, at Swissa's request. Among other things, Swissa used the field access to pitch Superdigital's services to executives of Massachusetts-based Papa Ginos and D'Angelos Grilled Sandwiches, who also had field access. To prop up his own credibility, Swissa associated himself with Edelman and explained that he could deliver Edelman as talent in advertisements and marketing content. This materialized into a key client for Superdigital.[1]

### Guy Fieri

60.    In or around 2016, Edelman arranged for Swissa to meet with a member of Guy Fieri's marketing team so that he could pitch Superdigital's social media marketing capabilities.

61.    Edelman had developed a personal relationship with Guy Fieri through the Best Buddies International charity.

62.    At Swissa's request, Edelman used this relationship to arrange a meeting for Swissa to pitch Superdigital.

63.    Superdigital eventually began managing Guy Fieri's social media accounts and merchandising arm, which increased its visibility and enhanced its reputation. Edelman's efforts to introduce Swissa and/or Superdigital to Guy Fieri and his team allowed Swissa to make inroads into the Los Angeles chef market – this led to additional work for Superdigital.

---

[1] In 2015, Swissa also won an Emmy Award for writing shortform for the *Julian Edelman Draft Report*, entitled "Only Two Things You Can Do," which Superdigital produced for private coaching company CoachUp. This is only one example of Edelman being at the center of Swissa's success.

12

**Microsoft**

64. In or around 2018, Edelman pleaded for Swissa to have access to a private breakfast event, where executives of Microsoft were going to be present. At the time, Superdigital was not succeeding financially, and Swissa collaborated with Edelman about growing the business and accessing a corporate client base.

65. As they often did, Edelman's agents and others, pushed back when Edelman sought to get Swissa access to this event.

66. Once inside, Swissa used this event to connect with Microsoft executives regarding Superdigital's capabilities.

67. Eventually, and as a result of networking occurring at this breakfast, Microsoft became Superdigital's most important and lucrative client, which was a major driver of Superdigital's marketable value when it sold.

68. Superdigital began promoting Xbox, which is owned by Microsoft.

69. Superdigital promoted Copilot+ on behalf of Microsoft. These Xbox and Copilot+ deals were major deals for Superdigital.

70. Upon information and belief, roughly 30-40% of Superdigital's annual revenue was attributable to Microsoft.

**Meetings in Napa, California**

71. In or around 2018, Swissa and Edelman discussed their plans to grow and expand Superdigital. Towards this end, Edelman and his father, Frank Edelman, traveled to Napa, California to meet with Swissa and investors about Superdigital and Coast Productions, and a plan to market the two companies together as a "one-stop-shop" media conglomerate.

13

72.    Specifically, Swissa, along with Edelman, pitched the idea to investors that Swissa and Edelman were "partners" and the owners of Superdigital along with Coast Productions, and that they were interested in getting investments capital to create a media conglomerate that could handle both social media and other advertising as well as production.

### Hasbro

73.    In or around 2020, Edelman was critical in landing Superdigital a collaboration with Hasbro, where Superdigital was hired to produce a viral web series called "NERF House," parodying reality television and content houses.

74.    The series featured NFL stars, including Edelman, Joe Burrow, JuJu Smith-Schuster, and Christian McCaffrey, shooting Nerf darts at each other in the house.

75.    This increased Superdigital's credibility and led to other deals with Hasbro, including for Monopoly and other Hasbro produced, and it generated substantial revenue for Superdigital for several years.

**D.    Swissa Sells Superdigital for Millions Without Paying Edelman Anything, Leading to an Altercation in Boston, Massachusetts**

76.    Beginning in fall 2024, Swissa began exploring potential buyers for Superdigital. At or around this time, Swissa disclosed to Edelman and others close to him that he was considering selling Superdigital, but Swissa withheld any further details from Edelman for much of the next year. For example, Swissa would quickly change the topic, whenever the sale came up in conversations with Edelman or those associated with Edelman.

77.    In August of 2025, Accenture acquired Superdigital for nearly $50 million. Despite Edelman's valuable contributions and services provided to Superdigital over the course of twelve years, and the fact that practically all Swissa's successful projects involved or primarily featured Edelman, Swissa did not inform Edelman in advance of the sale. On the

14

contrary, Edelman learned of the sale from a third-party. In or around August, 2025, after the sale of Superdigital, Swissa telephoned Frank Edelman, Edelman's father, to tell him that Superdigital had sold. Frank Edelman stated to Swissa that Edelman was due "a piece" of the deal. In response, Swissa expressly represented to Frank Edelman that he would "take care of you guys," and that Edelman would be compensated.

78.    In August of 2025, at or around the time Superdigital was purchased, Edelman and Swissa were together in Boston working on a project for Dunkin' Donuts. Edelman confronted Swissa regarding the sale, which resulted in a verbal altercation. Hurt and shocked about the circumstances of Superdigital's sale, Edelman stated to Swissa, "I've gone to bat for you for years; I helped you build that company and got you a lot of your deals; you couldn't pay me anything?" In response, Swissa stated, "[w]e're best friends and shouldn't say things right now while we're emotional. We'll revisit this at the appropriate time."

79.    Upon information and belief, Swissa himself made $18.5 million after taxes as a result of the sale of Superdigital.

80.    Swissa has not compensated Edelman in any manner whatsoever following the sale of Superdigital.

81.    In the weeks after the sale, Swissa acknowledged to Edelman, including in writing, their fractured relationship, reflecting on "what they had built together," with respect to Superdigital, calling Edelman "a brother." Swissa offered to "walk away" from Coast Productions altogether, which is now known as Nuthouse Sports, but he did not offer Edelman any compensation in connection with the sale. Indeed, Swissa  has not revisited his representation that he would "take care of" Edelman in connection with the sale of Superdigital.

15

Date Filed 4/17/2026 4:46 PM
Superior Court - Suffolk
Docket Number

## COUNT I
### (Quantum Meruit/Unjust Enrichment)

82.    Edelman incorporates by reference the allegations set forth above as if fully set forth herein.

83.    By retaining the entirety of the economic benefit from the sale of Superdigital to Accenture and failing to provide Edelman the promised equity or any compensation reflecting Edelman's contributions and services over a twelve-year period, Swissa was unjustly enriched at Edelman's expense after benefiting for years from Edelman's name, image, access to clientele, and professional achievements.

84.    More specifically, between July 2013 and August 2025, Edelman provided extensive services to Swissa and/or Superdigital. As further detailed above, these services not only included providing input for content and promoting Superdigital publicly but also making key introductions to Swissa and/or Superdigital to prospective clients, which materialized into key projects for Swissa and/or Superdigital. Edelman's involvement, for the reasons set forth above, led to Superdigital's ability to land the majority of its major clients.

85.    Edelman's services provided significant monetary value to Swissa and/or Superdigital.

86.    Swissa knew that Edelman's services, described above, were being provided for Superdigital, and that Edelman had a reasonable expectation of being compensated for providing the services.

87.    Swissa repeatedly represented to Edelman that he would be compensated for his services.

88.    Edelman has not been compensated for the services he provided and has suffered monetary damages as a result of this failing by Swissa.

16

89.     Swissa has been unjustly enriched at Edelman's expense.

90.     Edelman is entitled to the value of the services he rendered to Swissa and/or Superdigital arising from his services.

91.     Edelman has suffered and continues to suffer monetary and non-monetary damages.

## COUNT II
### (Declaratory Judgment)

92.     Edelman incorporates by reference the allegations above as if fully set forth herein.

93.     An actual, present, and justiciable controversy exists between the parties concerning whether Edelman and Swissa reached an oral agreement that Edelman was a partner in Superdigital owning a membership  interest in Superdigital

94.     Upon information and belief, Swissa was Superdigital's only member before Edelman, too, became a member.

95.     Swissa and Edelman conducted themselves as partners.

96.     Swissa stated to Edelman and others that Edelman was his partner in their "digital ad agency," Superdigital.

97.     Swissa repeatedly stated to Edelman that Edelman was his partner in Superdigital.

98.     A judicial declaration is necessary and appropriate to resolve the parties' rights and obligations, including whether Edelman is entitled to share of sale proceeds corresponding to his ownership interest in Superdigital.

17

## COUNT III
## (Breach of Fiduciary Duty)

99.     Edelman incorporates by reference the allegations above as if fully set forth herein.

100.    By nature of the relationship between Swissa and Edelman, and, in particular, the ownership interest Edelman possesses in Superdigital, Swissa owed Edelman a fiduciary duty of good faith and loyalty.

101.    By and through the acts and omissions set forth above, including by and through Swissa's intentional and fraudulent conduct, Swissa breached his fiduciary duties to Edelman.

102.    Without limitation, and as more fully alleged above, Swissa knowingly and falsely and/or recklessly represented to Edelman on several occasions over a period of years that Swissa would compensate Edelman for all the services Edelman provided in furtherance of Superdigital. However, Swissa made this series of false representations with the purpose of inducing Edelman to continue providing services, including, without limitation, introducing Swissa to potential clients for Superdigital and allowing Swissa to use Edelman's name in business situations and pitches. Swissa made these representations without ever intending to pay Edelman any compensation out of the sale of Superdigital (or otherwise fairly compensating Edelman). Additionally, in or around the spring and summer of 2025, Swissa concealed key details from Edelman regarding the sale of Superdigital to Accenture for nearly $50 million and then failed to pay Edelman any compensation following the sale, despite his express promises to do so and to compensate Edelman for his years of services to Superdigital.

103.    Swissa's breach of his fiduciary duty has caused Edelman to suffer significant damage.

18

## COUNT IV
### (Promissory Estoppel)

104.    Edelman incorporates by reference the allegations above as if fully set forth herein.

105.    Swissa made clear and definite promises that Edelman would receive fair compensation in exchange for his continued services on behalf of Superdigital.

106.    Edelman reasonably and foreseeably relied on those promises to his detriment by continuing to provide substantial services to Superdigital.

107.    Among other things, had Swissa not misrepresented his intentions to compensate Edelman for his services rendered to Superdigital, Edelman would have reserved the above-described business opportunities, which Superdigital benefitted from, for companies in which Edelman had a personal interest.

108.    Injustice can be avoided only by enforcing Swissa's promises through an award measured by the promised interest or the value of Edelman's detrimental reliance.

## COUNT V
### (Equitable Accounting)

109.    Edelman incorporates by reference the allegations above as if fully set forth herein.

110.    The parties' dealings over years, Swissa's control of Superdigital's books, and the concealed sale of Superdigital necessitate an equitable accounting of revenues, profits, and sale proceeds attributable to Edelman's services in assisting Superdigital land the several key clients described above.

### PRAYER FOR RELIEF

**WHEREFORE**, Edelman respectfully requests that the Court grant the following relief:

19

i.        Enter judgment in favor of Edelman and against Swissa on each of the Counts asserted herein, and award them all damages allowed by law;

ii.        Declare that Edelman and Swissa formed an oral agreement to be partners with respect to Superdigital and that Edelman owns a partnership interest in Superdigital;

iii.        Declare that Edelman is entitled to a percentage of the sale of Superdigital which corresponds with his partnership interest in Superdigital;

iv.        Order an equitable accounting of Superdigital's revenues, profits, and the Accenture sale proceeds; and

v.        Enter such other relief as the Court deems reasonable, appropriate, and necessary.

## JURY DEMAND

Edelman demands a trial by jury on all claims so triable.

Respectfully submitted,
JULIAN EDELMAN,

By his attorneys,


*/s/ Benjamin J. Wish*
Benjamin J. Wish (BBO No. 672743)
*bwish@toddweld.com*
Gregory R. Browne (BBO No. 708988)
*gbrowne@toddweld.com*
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626


Dated: April 17, 2026

20